**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **MARY K. ANDERSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 3:14-cv-02384** |
| **v.** | ) | **Judge Sharp** |
| | ) | **Magistrate Judge Bryant** |
| **MIRACLE CHRYSLER PLYMOUTH** | ) | **JURY DEMAND** |
| **DODGE, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Pending before the Court is Defendant Miracle Chrysler Plymouth Dodge, Inc.'s

("Miracle Chrysler") Motion for Summary Judgment. (Docket No. 17.) For the reasons stated

below, the Motion will be granted as to Plaintiff's sexual harassment and retaliatory harassment

claims and denied as to Plaintiff's retaliatory discharge and punitive damages claims.

## BACKGROUND[1]

### I.     Hiring and Position Change

Miracle Chrysler is an automobile dealership in Gallatin, Tennessee. Anderson worked

at Miracle Chrysler from 2008 until she was fired in 2013. Her termination, along with the

events that led to it, is the subject of this suit.

Anderson was originally hired as an accounting assistant. She spent about a year in that

role before Kathleen Barrett—Anderson's supervisor—decided to make Anderson a title clerk.

Title clerks are responsible for making sure that a car's title was properly transferred after a sale.

As a title clerk, Anderson was never asked to perform any payroll, accounts receivable,

or accounts payable duties. Nor was she required to manage any other employees. Instead, she

---

[1] Unless otherwise indicated, these facts are undisputed.

was asked to "ensure[] that the sales folders (sometimes called the 'deal files') [we]re complete[] and coordinate[] the transfer of title of cars."  (Docket No. 17-2, p. 3.)  In her declaration, Barrett says that she moved Anderson to the new position because her work in the accounting department was poor.  Barrett says that "[i]f [she] had thought that Ms. Anderson was doing a good job as accounting clerk, [Barrett] would not have moved her to the position of title clerk." (Docket No. 17-2, p. 3.)

According to Miracle Chrysler, Anderson continued making mistakes after becoming a title clerk.  Barrett said that Anderson was poorly organized and prone to mistakes—two qualities that caused problems for Barrett, given the importance of organization and diligence in handling deal files.  Barrett also said that she gave Anderson verbal and written warnings "on more than one occasion:" specifically, for Anderson's failure to process out-of-state titles in January 2010 and for her failure to follow vehicle-identification procedures in February 2010. (Docket No. 17-2, p. 4.)  Generally, Barrett says, these kinds of mistakes were so frequent that Anderson's performance was "a subject of discussion . . . throughout" Anderson's employment at Miracle Chrysler.  (Docket No. 17-2, p. 4.)

Despite the written warnings in 2010, Anderson remained a title clerk.  Her work began showing signs of improvement by 2012.  (She even received a raise that year.)  In fact, from 2012 until October 2013, Anderson never received a formal reprimand from her supervisors.

## II.  Sexual Harassment and Retaliation

In April 2012, Jessica Williams—a former Miracle Chrysler employee—called Anderson and told her that General Manager Tim Galvin had made unwelcome sexual advances toward Williams at work.   Williams told Anderson that Galvin had sent her "disgusting text[ messages] about how much he want[ed] her" and told her that he "want[ed] her to cut his hair," threatening

to have her fired if she refused his advances.  (Docket No. 17-4, p. 36.)  In the same conversation, Williams told Anderson that Galvin had once called another employee, Terri Appleton, for a ride home from a bar.  Williams said that Galvin "got real grabby" with Appleton on the drive over and, once the car was parked, threw Appleton's keys into the yard, pinned her against her car, and "beg[ed] her to come inside."  (Docket No. 17-2, p. 38.)

The next day, Anderson told Barrett about her conversation with Williams.  In doing so, Anderson believed that she was complying with Miracle Chrysler's written anti-harassment policy, which states that an employee who experiences harassment "should make [her] feelings immediately known to [her] Supervisor, . . . or Kathleen Barrett."[2]   (Docket No. 17-8, p. 2.) Anderson read that policy and watched a video on sexual harassment at Miracle Chrysler. (Docket No. 17-4, p. 38.)  After Williams told her about Galvin's behavior, Anderson felt that she "could be held responsible for not reporting" it.  (Docket No. 17-4, p. 38.)

According to Anderson, Barrett told Anderson that "men will be men" and promised to talk with Galvin.  (Docket No. 17-4, p. 39.)  Anderson says that Barrett later told her that she had warned Galvin that "he's jeopardizing all our jobs here by doing this with these girls."  (Docket No. 17-4, p. 39.)  Anderson also said that Barrett warned her not to speak with anybody else about her conversation with Williams.  Anderson and Barrett did not discuss Williams's phone call again.

Anderson remained concerned about Galvin's behavior.  Then, in May 2012, Anderson saw Galvin getting "hands-y" with Lindsey McVey, another young woman who worked at

_____

[2] Miracle Chrysler also has an Equal Opportunity Policy, which states that Miracle Chrysler "strives to provide equal employment opportunities for all employees . . . in compliance with federal, state, and local laws governing nondiscrimination in employment."  (Docket No. 17-7, p. 2.)  The policy also provides that an employee who "believe[s] there has been a violation of this policy . . . must report it promptly," and assures employees that "no adverse action will result" from reporting discriminatory conduct.  (Docket No. 17-7, p. 2.)

Miracle Chrysler.  (Docket No. 17-4, p. 40.)  Anderson found Galvin's behavior "unsettling" and "very uncomfortable," particularly since McVey was "very impressionable and . . . very young." (Docket No. 17-4, p. 40.)  But this time, Anderson went directly to Lisa Smelser, Miracle Chrysler's Service Manager, and told her about Galvin's behavior.

This apparently angered Barrett.  The next month, while Anderson was on vacation, Barrett called Anderson to tell her that Anderson should not have spoken with Smesler and said that they would "talk about whether [Anderson would] have a job when [she] came back." (Docket No. 17-4, p. 45.)  Still, Barrett never fired Anderson once she returned to work.  Instead, Barrett told Anderson that she "was disappointed in" her, and told her that she "wasn't supposed to speak of it ever again."  (Docket No. 17-4, p. 45.)

Within a few months of reporting her concerns about Galvin, Anderson says, the "tone of the office just changed."  (Docket No. 17-4, pp. 23, 51.)  Anderson testified that Barrett "would call [Anderson] out on mistakes in front of people" and humiliate her in front of her coworkers. (Docket No. 17-4, p. 23.)  Anderson soon began keeping track when Barrett seemed to treat her differently from other workers.  (Docket No. 17-4, p. 23.)

Some of these instances were obvious.  Anderson noted that Barrett once chastised Anderson after Anderson's stepfather briefly visited the office; this came after Barrett had repeatedly allowed another employee to bring her young child into the office for several hours at a time.  (Docket No. 17-4, p. 26.)  Other instances were more subtle.  On January 16, 2013, Anderson noted that Barrett did not discipline another worker for undercharging a customer. (Docket No. 17-4, p. 24.)  And on May 7, 2013, Barrett discovered that another employee had failed to file documents correctly; Anderson noted that instead of becoming angry with the employee, Barrett "very nicely" asked her to correct the error.  (Docket No. 17-4, p. 25.)  In both

situations, Anderson felt as though she had been reprimanded for making similar mistakes. (Docket No. 17-4, p. 24 ("If I made a clerical error or forgot to do a temp lien on a customer because there's a stack . . . I was berated for it.").)

Anderson thought that Barrett followed a "double standard" and unfairly targeted Anderson because she had reported Galvin's misconduct. (Docket No. 17-4, p. 26.) This seemed to be supported by Barrett's suspicion of Anderson's friendship with Williams and Appleton. Anderson said that Barrett told her that "[Anderson] would lose [her] job" if she "didn't stop hanging out with" Appleton and Williams, even outside of work.[3] (Docket No. 17-4, p. 51.)

## III.    Termination

In October 2013, Miracle Chrysler was preparing for a periodic audit by Chrysler. As part of the effort, Anderson was given about 100 deal files to review for accuracy and completeness. Barrett reviewed Anderson's work and noticed "numerous errors and inattention to detail." (Docket No. 17-2, p. 11.) To Barrett, Anderson had made basic, inexcusable errors—mistakes that "should not have been made by someone with [Anderson's] experience," especially in light of Barrett's multiple conversations with Anderson about "the importance of making sure all of the paperwork was complete." (Docket No. 17-2, p. 11.)

Barrett fired Anderson on October 28, 2013. (Docket No. 17-2, p. 11.) In her termination report, Barrett wrote that she had made the decision based on "continued frustration with [Anderson's] failure to provide needed attention to . . . paperwork." (Docket No. 17-2, p. 11.)

This action followed.

---

[3] Appleton also sued Miracle Chrysler sometime before Anderson's termination. Anderson "was aware of" the lawsuit, but is unsure of when the suit was filed. (*See* Doc. No. 17-4 at 45–46.)

## PROCEDURAL HISTORY

Anderson filed her Complaint on December 22, 2014.  (Docket No. 1, p. 4.)  Miracle Chrysler filed its Motion for Summary Judgment on January 22, 2016 (Docket No. 17), along with a Memorandum in Support (Docket No. 18), a Statement of Undisputed Material Facts (Docket No. 17-1), and seven exhibits (Docket Nos. 17-2–17-8).  Anderson filed her Response in Opposition on February 19, 2016 (Docket No. 21), along with a Response to Defendant's Statement of Undisputed Material Facts (Docket No. 22) and one supporting exhibit (Docket No. 21-1).  Miracle Chrysler filed a Reply brief on March 3, 2016.  (Docket No. 23.)

## STANDARD OF REVIEW

Summary judgment is rendered when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Where a moving party without the burden of proof at trial seeks summary judgment, the movant "bears the initial burden of showing that there is no material issue in dispute."  Lindsay v. Yates, 578 F.3d 407, 414 (6th Cir. 2009) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  "Once a moving party has met its burden of production, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'"  Blizzard v. Marion Tech. Coll., 698 F.3d 275, 282 (6th Cir. 2012) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).  The Court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  "Reviewing the facts in the light most favorable to the nonmoving party, the court must ultimately determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so

one-sided that one party must prevail as a matter of law." Blizzard, 698 F.3d at 282 (internal citations and quotations omitted).

A movant with the burden of proof, however, must present evidence "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." Calderone v. United States, 799 F.2d 254, 259 (6th Cir. 1986) (citation omitted). The movant "must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." Arnett v. Myers, 281 F.3d 552, 561 (6th Cir. 2002) (citation omitted). Summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." Hunt v. Cromartie, 526 U.S. 541, 553 (1999).

## ANALYSIS

Anderson brings the following claims against Miracle Chrysler under Title VII of the Civil Rights Act of 1964 ("Title VII"): (A) Barrett harassed Anderson because of her sex; (B) in retaliation for reporting Galvin's harassment of other employees to Barrett and Smelser, Barrett terminated Anderson's employment; and (C) in retaliation for reporting Galvin, Barrett harassed Anderson. Anderson also seeks punitive damages. (Docket No. 1.) Miracle Chrysler moves for summary judgment on all claims.

### I. Hostile Work Environment

Anderson alleges that she was harassed because of her sex at Miracle Chrysler. Under Title VII, employers may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (2012). A plaintiff alleging hostile work environment discrimination must establish the following elements: "(1) she was a

member of a protected group, (2) she was subjected to unwelcome harassment, (3) the harassment was based upon the employee's protected status, . . . (4) the harassment affected a term, condition, or privilege of employment, and" (5) the employer bears responsibility for the harassment.  Michael v. Caterpillar Fin. Servs. Corp., 496 F.3d 584, 600 (6th Cir. 2007) (quoting Farmer v. Cleveland Pub. Power, 295 F.3d 593, 605 (6th Cir. 2002)); Mast v. IMCO Recycling of Ohio, Inc., 58 F. App'x 116, 119 (6th Cir. 2003).  Anderson is a member of a protected class because of her sex.  42 U.S.C. § 2000e-2(a)(1).  Miracle Chrysler contends that Anderson has not presented evidence of the remaining elements.

Anderson contends that she was harassed by Barrett in a nonsexual manner because of her sex.  (Docket No. 21, p. 7.)  Workplace harassment need not be overtly sexual to be actionable under Title VII.  Williams v. Gen. Motors Corp., 187 F.3d 553, 565 (6th Cir. 1999).  "To establish that the harm was 'based on her sex,' [the plaintiff] 'must show that but for the fact of her sex, she would not have been the object of harassment.'"  Id. (citation omitted).  This inference is "'easy to draw' with male-female sexual harassment . . . [but] not automatically available with same-sex harassment."  Wasek v. Arrow Energy Servs., Inc., 682 F.3d 463, 467 (6th Cir. 2012).  In cases of same-sex harassment,

> A trier of fact may infer that harassment occurred because of sex when the plaintiff can produce (1) "credible evidence that the harasser was homosexual," (2) evidence that "make[s] it clear that the harasser is motivated by general hostility to the presence of [the same sex] in the workplace," or (3) "comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace."

Id. at 467–68 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80–81 (1998)).

Same-sex harassment plaintiffs proceeding under the first method typically present evidence that the harasser was homosexual and that the harassment involved "explicit or implicit

proposals of sexual activity" in order to permit the trier of fact to infer that the harassment was "motivated by sexual desire," and therefore based on sex. Oncale, 523 U.S. at 80. This method of proving harassment based on sex is inapplicable here. Although Anderson complained about harassment involving proposals of sexual activity by a male supervisor, that harassment was directed at other employees, and Anderson does not allege that she was subject to harassment of a sexual nature. Indeed, Anderson admits that the harassment she faced was nonsexual (Docket No. 21, p. 7), and she has not presented any evidence of Barrett's sexual orientation, as she must to prove she was harassed based on sex under this method. See Wasek, 682 F.3d at 468.

Under the second method of establishing same-sex harassment based on sex, plaintiffs typically present evidence that "a woman harassed other women 'in such sex-specific and derogatory terms . . . as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace.'" Baugham v. Battered Women, Inc., 211 F. App'x 432, 439 (6th Cir. 2006) (quoting Oncale, 523 U.S. at 80). For instance, in Williams, 187 F.3d at 565–56, the plaintiff's evidence that her co-workers ostracized her and used "gender-specific epithets" such as "slut" and "fucking women" was sufficient to "create an inference . . . that her gender was the motivating impulse for her co-workers' behavior." On the other hand, evidence that the harasser in Wade v. Automation Personnel Services, Inc., 612 F. App'x 291, 297 (6th Cir. 2015), gave the plaintiff "the silent treatment" and once referred to herself as the "bitch in charge" was insufficient to permit the inference that the harasser's conduct was motivated by sex because the comment, though it may have sexual content or connotations, did not reveal hostility to women in the workplace.

Anderson presents evidence that Barrett belittled her and made her "feel small" (Docket No. 17-4, p. 48), and on one occasion Barrett may have ostracized Anderson by encouraging

other employees to inform on her if she did not lie about Galvin's whereabouts. However, Anderson does not present evidence of the words Barrett used to criticize her, nor does she allege that Barrett harassed her using sex-specific or derogatory terms, as she must to establish that the harassment was based on sex under this method. Baugham, 211 F. App'x at 439.

Under the third method of showing same-sex harassment based on sex, plaintiffs present "comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace" to show that "members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." Smith v. Rock-Tenn Servs., Inc., 813 F.3d 298, 307–08, 309 (6th Cir. 2016). This comparative evidence permits the finder of fact to infer that the harassment was based on sex, and not merely "simple belligerence" motivated by personal animus that is not prohibited by Title VII. Morris v. Oldham Cty. Fiscal Court, 201 F.3d 784, 791 (6th Cir. 2000). For instance, the plaintiff in Smith, 813 F.3d at 309, established that his harassment was based on sex by presenting evidence that the harasser inappropriately touched him and at least seven of his male colleagues, but the harasser did not touch women working in the same department. In Rayford v. Illinois Central Railroad, 489 F. App'x 1, 4 (6th Cir. 2012), on the other hand, the plaintiff's evidence that his harasser made a remark about his sexual behavior and that his co-workers teased him afterwards was insufficient to permit an inference that the plaintiff was harassed based on sex because the plaintiff did not know whether the harasser engaged in similar conduct with women, and his co-workers' comments were "not directed at him because of his sex, but rather were designed to make fun of him."

Here, Anderson has not presented any comparative evidence. Anderson presents no evidence regarding Barrett's treatment of male employees. Furthermore, Anderson's evidence of

Barrett's harassment relates only to her—other women in the office were not criticized when Anderson was, or felt she would have been, for making the same or similar mistakes.  (See Docket No. 17-4, pp. 24–29.)  Because Anderson has not presented evidence that members of one sex were exposed to disadvantageous conditions of employment to which members of the other sex were not exposed, she has not presented evidence from which the finder of fact could infer that her harassment was based on sex, not personal animus.  See Smith, 813 F.3d at 309.

The Court finds Anderson has not presented evidence that any harassment she faced was based on her sex and grants Miracle Chrylser's Motion as to Anderson's hostile work environment discrimination claim.

## II.     Retaliatory Discharge

Anderson alleges Barrett retaliated against her for complaining about Galvin's harassment of other employees by terminating her employment.  Title VII's anti-retaliation provision prohibits an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by this [Act]."  42 U.S.C. § 2000e-3(a).  A plaintiff may prove retaliation with direct or circumstantial evidence.  Imwalle v. Reliance Med. Prods, Inc., 515 F.3d 531, 544 (6th Cir. 2008).  In the absence of direct evidence, retaliation claims are analyzed under the McDonnell Douglas burden-shifting framework.  Id.  A plaintiff establishes a prima facie case of retaliation by showing the following:

> (1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, *or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor*; and (4) there was a causal connection between the protected activity and the adverse employment action *or harassment*.

Morris, 201 F.3d at 792 (emphasis original).  If a retaliatory discharge plaintiff establishes a prima facie case, the burden shifts to the defendant to establish a legitimate, non-retaliatory

reason for terminating the plaintiff.  Imwalle, 515 F.3d at 544.  If the defendant meets this burden, the plaintiff must show that "the legitimate reason offered by the defendant was not its true reason, but instead was a pretext designed to mask retaliation."  Id.

The parties do not dispute that Anderson has presented sufficient evidence to meet the first three elements of her prima facie case of retaliatory discharge.  First, her complaints about Galvin's alleged sexual harassment constitute protected activity.  See Johnson v. Univ. of Cincinnati, 215 F.3d 561, 580 (6th Cir. 2000) (complaints about discrimination against someone else constitute "opposition" and are a protected activity under Title VII).  Barrett knew of Anderson's complaints because Anderson complained to Barrett, and because Barrett told Anderson that she knew Anderson complained to Smelser.  Mulhall v. Ashcroft, 287 F.3d 543, 552 (6th Cir. 2002) (knowledge established where adverse action taken by same supervisor to whom plaintiff made initial complaint).  Finally, Anderson's employment was later terminated.  See Univ. of Cincinnati, 215 F.3d at 581 (termination is an adverse action).  Miracle Chrysler argues (1) there is no causal connection between Anderson's complaints and her termination, and (2) Anderson presents no evidence that the proffered reason for her termination was a pretext for retaliation.  (Docket No. 23, pp. 17–23.)

1.  Causation

To establish a prima facie case of retaliatory discharge, Anderson must present evidence of a causal connection between her complaints about sexual harassment at Miracle Chrysler and her termination.  "To establish the causal connection required in the fourth prong, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not" engaged in protected activity.  Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000).  Where the plaintiff's termination is very close

12

in time to when the employer learns of the plaintiff's protected activity, temporal proximity alone is sufficient establish causation. Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 525 (6th Cir. 2008) (holding that where plaintiff was terminated the day his employer learned of protected activity, plaintiff presented evidence of causal connection); Singfield v. Akron Metro. Hous. Auth., 389 F.3d 555, 563 (6th Cir. 2004) (holding plaintiff presented evidence of causal connection where he was terminated over three months after protected activity). However, "[a] time period greater than six months, without more, is not a sufficiently short period of time to satisfy the causal connection element of a retaliation claim." Nicholson v. City of Clarksville, 530 F. App'x 434, 448 (6th Cir. 2013); see Jones v. City of Franklin, 468 F. App'x 557, 565 (6th Cir. 2012) (recognizing temporal proximity alone may be sufficient to establish causation where the gap between protected activity and adverse action is under six months). Anderson last complained about Galvin's harassment of other employees to Smelser in May 2012 but she was not terminated until October 2013, nearly a year and a half later. (Docket No. 18, p. 23.) Given the time elapsed between Anderson's complaint and her termination, she cannot rely on temporal proximity alone to establish causation. Nicholson, 530 F. App'x at 448.

Miracle Chrysler contends this gap is fatal to Anderson's claim. (Docket No. 18, p. 24.) However, the Sixth Circuit "expressly rejects the . . . position that a span of more than six months between protected activity and adverse action categorically precludes finding causation." Sharp v. Aker Plant Servs. Grp., Inc., 600 F. App'x 337, 341 (6th Cir. 2015). To overcome a lack of temporal proximity, "the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality," such as heightened scrutiny or threats. Mickey, 516 F.3d at 525; see, e.g., Harrison v. Metro. Gov't of Nashville & Davidson Cty., 80 F.3d 1107, 1119 (6th Cir. 1996), overruled on other grounds by Jackson v. Quanex Corp., 191 F.3d 647, 667

(6th Cir.1999).  For instance, in <u>Harrison</u>, 80 F.3d at 1119, the plaintiff was terminated one year and three months after engaging in protected activity, but he established causation by presenting evidence that he was subject to heightened scrutiny after engaging in protected activity, that "three employees feared retaliation because they testified at [his EEOC] hearing, and that [the harasser] made repeated comments that suggested he would not hesitate to run employees out of his department."  Similarly, in <u>Parries v. Makino, Inc.</u>, 148 F. App'x 291, 301 (6th Cir. 2005), the plaintiff overcame an eleven-month time gap to establish causation with evidence that he "may have been subjected to excessive scrutiny of his conduct and may have experienced 'more frequent disciplinary write-ups . . . for trivial matters'" than his colleagues, such as making strange noises while working.

Like the plaintiffs in <u>Harrison</u> and <u>Parries</u>, Anderson alleges Barrett subjected her to heightened scrutiny after she complained about Galvin.  Anderson avers that Barrett began to belittle her in front of other employees for making mistakes, but she did not do this before Anderson complained about Galvin's harassment, or do this to other employees.  (<u>See</u> Docket No. 17-4, p. 24.)  Anderson also alleges that Barrett asked other employees to report to her if Anderson did not lie about Galvin's whereabouts, and Barrett berated her when her father visited the dealership even though she said nothing on the occasions another employee brought her child to work.  (Id. at 26–29.)  Like the plaintiff in <u>Harrison</u>, whose supervisor threatened to run the plaintiff out of the department, Anderson's job was also threatened.  Anderson alleges Barrett threatened to fire her four times: once after Smelser told Barrett about the May 2012 conversation and three more times after Barrett discovered Anderson socialized with Galvin's accusers because Anderson did not "have their back."  (Id. at 51.)  Despite the long temporal gap between her complaints about Galvin and her termination, Anderson has presented sufficient

evidence to permit the inference that she would not have been terminated had she not complained. Anderson has therefore presented evidence of causation.

  2.  Legitimate, Non-Discriminatory Reason

Because Anderson put forth sufficient evidence to establish a prima facie case of retaliation, the burden shifts to Miracle Chrysler to proffer a legitimate, non-discriminatory reason for Anderson's termination. Imwalle, 515 F.3d at 544. "Poor job performance . . . is a perfectly legitimate, legal reason for firing an employee." Jones v. Potter, 488 F.3d 397, 409 (6th Cir. 2007); see, e.g., Singleton v. Select Specialty Hospital-Lexington, Inc., 391 F. App'x 395, 400 (6th Cir. 2010) (failure to maintain patient medical records constituted legitimate, non-discriminatory reason for adverse action). For instance, in Blizzard, 698 F.3d at 284, the plaintiff's failure to "follow proper procedures in using the new software systems, which resulted in unmanageable vendor lists, duplicate payments to vendors and errors in processing accounts payable receipts" constituted a legitimate, non-discriminatory reason for her termination. Likewise, the court in Hawkins v. Center for Spinal Surgery, 34 F. Supp. 3d 822, 830 (M.D. Tenn. 2014), found that the employer proffered a legitimate, non-discriminatory reason for the plaintiff's termination where the plaintiff made a series of increasingly severe accounting errors, including overpaying a vendor, incorrectly entering an invoice, and forgetting to close the employer's accounts payable.

Miracle Chrysler alleges that it terminated Anderson's employment because of poor performance. Barrett avers that she spoke to Anderson throughout her employment about the importance of properly maintaining deal files, and she issued Anderson two written warnings about her unsatisfactory work performance. (Docket No. 17-2, pp. 4, 19–20.) In the first warning, Barrett noted Anderson failed to properly confirm vehicle identification numbers and

properly "follow through with paperwork procedures," despite having been verbally warned once about the importance of following these procedures. (Id., p. 19.) In her second warning, Barrett noted Anderson failed to report an out-of-state vehicle registration and complete other paperwork in a timely manner, and warned Anderson that any future errors would result in termination. (Id., p. 20.) Nevertheless, in the course of reviewing approximately 100 deal files while preparing for a sales audit in October 2013, Barrett discovered "numerous errors and inattention to detail." (Id., p. 11.) Barrett avers she decided to fire Anderson because of these errors. (Id.) Miracle Chrysler has presented evidence that Anderson's performance was poor, a legitimate, non-discriminatory reason for Anderson's termination. Potter, 488 F.3d at 409.

### 3. Pretext

Because Miracle Chrysler proffered a legitimate, non-discriminatory reason for terminating Anderson's employment, Anderson must present evidence that this reason is a pretext for unlawful discrimination. See Imwalle, 515 F.3d at 544. Plaintiffs generally demonstrate pretext in one of three ways, by showing: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." Tingle v. Arbors at Hilliard, 692 F.3d 523, 530 (6th Cir. 2012) (citation omitted). "At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation. If so, her prima facie case is sufficient to support an inference of discrimination at trial." Montell v. Diversified Clinical Servs., Inc., 757 F.3d 497, 508 (6th Cir. 2014) (citation omitted).

Anderson argues that Miracle Chrysler's proffered reason has no basis in fact, but she cites no evidence to support this argument. (See Docket No. 21, pp. 12–13.) Indeed, although

16

Anderson contends that she "had not received any disciplinary action and had not been threatened with termination at all" prior to complaining about Galvin (id. at 11), the record shows that Anderson received a verbal warning in January 2010 and written warnings in February and August 2010, and the latter warned Anderson that future performance deficiencies could lead to termination.

Where a plaintiff seeks to show that the employer's proffered reason for his termination was insufficient to motivate its decision, the plaintiff generally presents "evidence that other employees, particularly employees not in the protected class, were not [subject to adverse action] even though they engaged in substantially identical conduct to that which the employer contends motivated its [action against] the plaintiff." Johnson v. Kroger Co., 319 F.3d 858, 866 (6th Cir. 2003) (citation omitted). For instance, the plaintiff in Madden v. Chattanooga City Wide Service Department, 549 F.3d 666, 676 (6th Cir. 2008), established pretext by showing that even though he was fired for setting off firecrackers at work, firecracker use on the job was commonplace and white employees who deployed firecrackers in the same or more dangerous ways than the plaintiff were not disciplined. As evidence of pretext, Anderson cites her descriptions of incidents in which other employees were not criticized for making mistakes at times when Anderson believes Barrett would have criticized her for making the same mistakes. (Docket No. 21, p. 13.) However, to establish pretext under this method, the plaintiff must show that she engaged in "substantially identical conduct;" a description of another employee's behavior without a comparison to the plaintiff's own behavior will not suffice. Kroger Co., 319 F.3d at 866. Anderson has not presented evidence of pretext under this method.

To establish pretext under the second method, by arguing that the proffered explanation did not actually motivate the discriminatory action, a plaintiff can "attack[] the employer's

explanation 'by showing circumstances which tend to prove an illegal motivation was *more*

likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight

of the circumstantial evidence of discrimination makes it more likely than not that the

employer's explanation is a pretext, or coverup." Smith v. Leggett Wire Co., 220 F.3d 752, 759

(6th Cir. 2000) (citation and internal quotation marks omitted); e.g., Montell, 757 F.3d at 508–09

(employee on performance improvement plan was warned that further errors could lead to

termination, but established pretext by showing no complaints about her performance while on

the plan, and that she was terminated before the end date of the improvement plan).

 For example, in Equal Employment Opportunity Commission v. New Breed Logistics,

783 F.3d 1057, 1070 (6th Cir. 2015), an employee terminated for habitual tardiness presented

evidence of pretext by showing that before she rejected her supervisor's sexual advances, he was

aware of her tardiness but did not object to it.  Likewise, in Yazdian v. ConMed Endoscopic

Technologies, Inc., 793 F.3d 634, 652–53 (6th Cir. 2015), an employee terminated for his poor

communication style presented evidence that even though his employer criticized his style before

he engaged in protected activity, he received positive performance reviews and was not warned

his style could lead to termination.  Because a jury could infer either that his failure to improve

his communication style led to his termination, or that he performed well but his style became a

problem for his employer after he complained about discrimination, summary judgment was

inappropriate.  Id. at 653.  Similarly, in Hamilton v. General Electric Co., 556 F.3d 428, 436 (6th

Cir. 2009), a plaintiff terminated for failing to abide by his employer's code of conduct presented

evidence that his employer subjected him to increased scrutiny after he engaged in protected

activity and waited for an excuse to fire him.  Noting that "when an 'employer . . . waits for a

legal, legitimate reason to fortuitously materialize, and then uses it to cover up his true,

longstanding motivations for firing the employee,' the employer's actions constitute 'the very definition of pretext,'" the Court found a reasonable fact-finder could conclude this was precisely what happened to the plaintiff. Id. (quoting Potter, 488 F.3d at 408).

Although Miracle Chrysler presents evidence that Anderson was warned about her performance deficiencies before she was terminated, Anderson presents evidence that she received her only written warnings in 2010, long before she complained about Galvin in 2012, and she alleges she was never told her performance was deficient after she received the last written warning. Indeed, the parties agree that Anderson was not reprimanded after June 2012 and that she received a raise that year. Furthermore, Anderson alleges that Barrett began to berate her in front of other employees and unfairly criticize her after she complained about Galvin, and that Barrett threatened her employment on four separate occasions because she told Smelser about Galvin's harassment of other employees and because Barrett discovered that Anderson socialized with Galvin's accusers. A jury could conclude that Anderson's failure to properly maintain the deal files was the actual reason for her termination. However, considering her clean disciplinary record from August 2010 to her termination in 2013, her raise in 2012, and Anderson's threats, a jury could also conclude that Barrett's performance was acceptable from 2010 on and became a problem only after she complained about Galvin. Because a reasonable finder of fact could conclude from this evidence that Miracle Chrysler waited for a legitimate reason to terminate Anderson in order to cover up its true motivation of retaliation, Anderson has presented sufficient evidence of pretext to avoid summary judgment. See id. As to this claim, Miracle Chrysler's Motion is denied.

## III.    Retaliatory Hostile Work Environment

Anderson also alleges that Barrett harassed her in retaliation for complaining about Galvin's harassment of other employees.  Miracle Chrysler contends that Anderson has not shown Barrett's behavior was sufficiently severe or pervasive to constitute a hostile work environment.  Workplace harassment is actionable under Title VII only if it is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Clark v. United Parcel Serv., Inc., 400 F.3d 341, 351 (6th Cir. 2005) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).  Courts do not "examine each alleged incident of harassment in a vacuum," but consider all incidents under the totality of the circumstances to determine whether the alleged harassment was objectively "severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive." Jackson v. Quanex Corp., 191 F.3d 647, 658–61 (6th Cir. 1999) (quoting Black v. Zaring Homes, Inc., 104 F.3d 822, 826 (6th Cir. 1997)).  In considering whether the harassment was objectively severe or pervasive, courts consider factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 333 (6th Cir. 2008) (quoting Jordan v. City of Cleveland, 464 F.3d 584, 597 (6th Cir. 2006)).  Whether the alleged harassment is sufficiently severe and pervasive is a question of fact, and "[s]ummary judgment is appropriate only if the evidence is so one-sided that there is no genuine issue of material fact as to whether there was a hostile work environment."  Id.

To be pervasive, the alleged harassment must be "ongoing, rather than a set of isolated or sporadic incidents."  Clark, 400 F.3d at 351.  For instance, the Clark court found that the plaintiff

failed to make out a prima facie case of hostile work environment gender discrimination where, over the course of two and a half years, her harasser "told vulgar jokes [monthly] . . . twice placed his vibrating pager on her thigh as he passed her in the hall, and most significantly, he pulled at her overalls after she told him she was wearing a thong" because these incidents "depict isolated instances rather than an ongoing situation." Id. at 351–52. Likewise, the plaintiff in Mast, 58 F. App'x at 119, failed to show pervasive harassment where she experienced five incidents of harassment in approximately nine months.

Anderson alleges that scrutiny of her work increased after she complained about Galvin and contends that she was routinely belittled for making trivial mistakes. However, she provides no specific examples of these belittling comments, and examples are necessary to support her claim that the comments were pervasive, and to determine whether they were severe. Fuelling v. New Vision Med. Labs. LLC, 284 F. App'x 247, 259 (6th Cir. 2008) (summary judgment affirmed where plaintiff presented no evidence to support conclusory assertions that harassment occurred "often" or "regularly"). Apart from the allegations relating to Barrett's criticism of her work, Anderson alleges that Barrett threatened her job on four occasions, berated her when her father visited the office, and asked other employees to inform her if Anderson did not lie about Galvin's whereabouts when he was absent for medical treatment. Even considered together, these allegations of six incidents of harassment between June 2012 and October 2013 "depict isolated instances rather than an ongoing situation." Clark, 400 F.3d at 352. Anderson has not presented evidence that she suffered pervasive harassment.

Furthermore, although Barrett allegedly made Anderson "feel small," Anderson presents no evidence that the harassment was severe. Courts must "distinguish between cognizable harassment and mere annoyance, as Title VII was not meant to become a 'general civility code' .

. . minor irritations do not amount to severe or pervasive harassment." Broska v. Henderson, 70

F. App'x 262, 269–70 (6th Cir. 2003); accord Clark, 400 F.3d at 351 (finding "distasteful and

boorish" behavior alone do not constitute pervasive or severe harassment). For instance, in

Willey v. Slater, 20 F. App'x 404, 405 (6th Cir. 2001), the alleged harasser "spoke to [plaintiff]

in a hostile or derogatory manner" and had an "openly negative and hostile" attitude towards the

plaintiff, but these facts were insufficient to show severe harassment. Anderson alleges that

Barrett addressed her in a hostile manner, but even though these incidents were likely unpleasant,

Anderson presents no evidence that the incidents were humiliating, physically threatening, or had

any impact on her work performance. Indeed, Anderson seems to recognize that the work

environment was not objectively hostile: "it would be okay if it was across the board, if

everybody got called out on their little goof-ups, you know, I would just suck it up and say, you

know, this is just the way this office was ran." (Docket No. 17-4, p. 24.)

The Court finds Anderson has not created a genuine dispute of material fact as to whether

she suffered a retaliatory hostile work environment. Miracle Chrysler's Motion as to this claim

is granted.

## IV.     Punitive Damages

Miracle Chrysler also seeks summary judgment on Anderson's claim for punitive

damages. A Title VII plaintiff seeking punitive damages must establish the following: (1) the

employer's agent acted with malice or reckless indifference to plaintiff's federally-protected

rights, and (2) the employer is liable for the agent's actions. Kolstad v. Am. Dental Ass'n, 527

U.S. 526, 539 (1999). Even if the plaintiff presents evidence of these two elements, however, the

employer may avoid punitive damages liability if it makes good-faith efforts to comply with

Title VII. Id. at 545–46. Miracle Chrysler does not argue that it is not liable for Barrett's

actions.  However, it contends that it cannot be liable for punitive damages under Kolstad because Anderson put forth no evidence that it acted with malice or reckless indifference to Anderson's rights under Title VII.  (Docket No. 18, p. 34.)  Furthermore, Miracle Chrysler argues that it made good-faith efforts to comply with Title VII by publicizing its harassment policies, and Anderson's failure to report Barrett's harassment voids any argument that Miracle Chrysler did not enforce the policies.  (Id., p. 34; Docket No. 23, p. 25.)

       1.  Malice or Reckless Indifference

To establish that the employer's agent acted with malice or reckless indifference, a plaintiff must show that the employer discriminated "in the face of a perceived risk that its actions will violate federal law."  Kolstad, 527 U.S. at 536.  Plaintiffs may establish this element by showing that "the relevant individuals knew of or were familiar with the anti[-]discrimination laws and the employer's practices for implementing those laws."  Hall v. Consol. Freightways Corp., 337 F.3d 669, 675 (6th Cir. 2003) (quoting Bruso v. United Airlines, Inc., 239 F.3d 848, 858 (7th Cir. 2001)); accord West v. Tyson Foods, Inc., 374 F. App'x 624, 638 (6th Cir. 2010) ("courts have found this element met where the plaintiff shows the supervisors involved in the decision at issue had anti-discrimination training or even very general knowledge about anti-discrimination laws or an employer's anti-discrimination policies").  For instance, in McDonough v. City of Quincy, 452 F.3d 8, 23 (1st Cir. 2006), the plaintiff's department published an anti-discrimination policy, provided anti-discrimination training, and the retaliating employees were "high-ranking department officials involved in personnel management," thus the plaintiff was entitled to a trial on the issue of punitive damages because the court could not conclude that "a reasonable jury would be compelled to find that these officials were unaware that retaliating against an employee for assisting with another employee's sexual harassment

claim violates federal law."  On the other hand, the court in Equal Employment Opportunity Commission v. Boh Brothers Construction Company, 731 F.3d 444, 468 (5th Cir. 2013), overturned a punitive damages award because the employer's policy included no guidance related to sexual harassment and the plaintiff presented no evidence that his harassers "subjectively understood that male-on-male sexual harassment, based on something other than sexual desire, was sufficient to violate federal law."

In this case, Anderson has put forth sufficient evidence that Barrett may have retaliated for complaining about another employee's sexual harassment in the face of a perceived risk that her conduct could violate federal law.  Miracle Chrysler maintains both Equal Opportunity and Harassment Policies.  (Docket No. 22, p. 9.)  The Equal Opportunity Policy states that employees will not suffer retaliation for reporting discrimination.  (Docket No. 17-7, p. 2.)  Furthermore, Barrett was a designated point of contact for employees to report harassment or other violations of "laws governing nondiscrimination in employment" under the Harassment Policy (Docket No. 22, pp. 8–9) and the Equal Opportunity Policy (see Docket No. 17-7, p. 2).  A reasonable juror could infer that because Barrett was responsible for fielding complaints under both policies, and because the Equal Opportunity Policy prohibits retaliation for reporting discrimination, Barrett knew retaliation violates federal law.  See Hall, 337 F.3d at 675.  Drawing all reasonable inferences in favor of Anderson as the non-moving party, the Court finds Anderson has presented sufficient evidence that Barrett acted with malice or reckless disregard for Anderson's rights to create a genuine dispute of material fact as to this element.

### 2.  Good-Faith Efforts to Comply with Title VII

To avoid liability for punitive damages, a defendant must "show that it engaged in good faith efforts to comply with Title VII" both by adopting an anti-retaliation policy and by

24

"effectively publiciz[ing] and enforc[ing] its policy." <u>Parker v. Gen. Extrusions, Inc.</u>, 491 F.3d 596, 603 (6th Cir. 2007); <u>accord</u> <u>West</u>, 374 F. App'x at 639. Miracle Chrysler presents evidence that it adopted a policy and publicized it: the Miracle Chrysler Equal Opportunity Policy forbids retaliation, and Anderson received a copy of the policy.[4] However, "it is not enough that the employer have a written or formal anti-discrimination policy. Rather, the employer must demonstrate that it engaged in good faith efforts to *implement* the policy. Otherwise, employers would have an incentive to adopt formal policies in order to escape liability for punitive damages, but they would have no incentive to enforce those policies." <u>Hall</u>, 337 F.3d at 675 (internal citations and quotation marks omitted).

Miracle Chrysler presents no evidence as to the enforcement of its anti-retaliation policy. Instead, Miracle Chrysler argues that it had no opportunity to enforce its policy because Anderson never reported Barrett's harassment, thus Miracle Chrysler cannot be liable for punitive damages. (Document Nos. 18, p. 34; 23, p. 25.) In support of this argument, Miracle Chrysler cites cases in which the plaintiff's failure to report harassment was relevant to the affirmative defense to liability for harassment established by <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775 (1998) and <u>Burlington Industries, Inc. v. Ellerth</u>, 524 U.S. 742 (1998). Under <u>Faragher</u> and <u>Ellerth</u>, if hostile work environment harassment does not culminate in a tangible employment action, the employer can avoid liability for the harassment by showing it (a) "exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or

---

[4] Although it notes that it required all employees to watch a video related to its sexual harassment policy, Miracle Chrysler presents no evidence of the content of that video, thus this fact does not support Miracle Chrysler's argument that it made good-faith efforts to publicize its anti-retaliation policy.

corrective opportunities provided by the employer or to avoid harm otherwise." <u>Ellerth</u>, 524 U.S. at 765.

Miracle Chrysler's argument fails for three reasons. First, the <u>Faragher</u>/<u>Ellerth</u> affirmative defense does not apply "when the supervisor's harassment culminates in a tangible employment action, such as discharge . . . ." <u>Faragher</u>, 524 U.S. at 808; <u>see, e.g.</u>, <u>Keeton v. Flying J, Inc.</u>, 429 F.3d 259, 262 (6th Cir. 2005) (termination is an adverse employment action that subjects employer to strict liability for sexual harassment); <u>New Breed Logistics</u>, 783 F.3d at 1071 (same). The primary purpose of Title VII "is not to provide redress but to avoid harm," thus the <u>Faragher</u>/<u>Ellerth</u> affirmative defense limits an employer's vicarious liability for a supervisor's misuse of authority in order to incentivize employers to "make reasonable efforts to discharge their duty" under Title VII by taking steps to prevent harassment. <u>Faragher</u>, 524 U.S. at 806. However, tangible employment actions require "an official act of the enterprise" and become "for Title VII purposes the act of the employer," thus if the supervisor's harassment culminates in a tangible employment action "it would be implausible to interpret agency principles to allow an employer to escape liability." <u>Ellerth</u>, 524 U.S. at 762–63. In this case, Anderson alleges that Barrett harassed her, and eventually fired her, in retaliation for complaining about Galvin's harassment of other employees. Because Barrett's conduct culminated in the adverse employment action of termination, Miracle Chrysler's Motion for Summary Judgment on this ground must be denied. <u>See</u> <u>Keeton</u>, 429 F.3d at 262.

Second, unlike the <u>Faragher</u>/<u>Ellerth</u> defense, the <u>Kolstsad</u> defense to liability for punitive damages "does not depend on the actions of the plaintiff but merely requires that the employer demonstrate it made 'good-faith efforts to prevent discrimination in the workplace.' The Supreme Court thus did not impose a requirement that an employee follow known procedures for

reporting harassment or retaliation in order to receive punitive damages."[5] McInnis v. Fairfield Cmtys., Inc., 458 F.3d 1129, 1140 (10th Cir. 2006) (internal citations omitted). Indeed, "employees will often face retaliation not for opposing discrimination they themselves face, but for reporting discrimination suffered by others. Thus, they are not 'victims' of anything until they are retaliated against, and it would be absurd to require them to 'mitigate' damages they may be unaware they will suffer." Crawford v. Metro. Gov't of Nashville & Davidson Cty., 555 U.S. 271, 279 n.3 (2009). Miracle Chrysler cites no authority to support its argument that the mitigation requirement of the Faragher/Ellerth defense applies to punitive damages claims. Anderson's failure to report retaliation does not establish Miracle Chrysler's entitlement to the Kolstad defense. McInnis, 458 F.3d at 1140.

Finally, the Faragher/Ellerth affirmative defense is specific to hostile work environment claims. Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765. This Court has determined that Anderson has not presented sufficient evidence as a matter of law to support her sexual harassment and retaliatory harassment claims, thus whether Anderson was subjected to a hostile work environment is no longer at issue in this case. The remaining issues are (1) whether Anderson's employment was terminated in retaliation for complaining about a co-worker's harassment, and (2) whether Miracle Chrysler is liable for punitive damages because it retaliated against Anderson with malice or reckless disregard for her federally-protected right not to suffer retaliation for engaging in a protected activity. Under Kolstad, "the existence and enforcement of a sexual harassment policy does not, by itself, demonstrate good-faith compliance with Title VII. The good-faith compliance must relate to the specific claim being raised under Title VII." Reed v. Cracker Barrel Old Country Store, 171 F. Supp. 2d 741, 748 (M.D. Tenn. 2001) (holding

---

[5] The Court notes that even though Miracle Chrysler's Equal Opportunity Policy prohibits retaliation, it does not provide any mechanism for reporting it.

success on <u>Faragher</u>/<u>Ellerth</u> defense does not preclude award of punitive damages for retaliation claim); <u>see, e.g.</u>, <u>New Breed Logistics</u>, 783 F.3d at 1074 (separately addressing whether defendant presented evidence of good-faith efforts to prevent sexual harassment and good-faith efforts to prevent retaliation).  Miracle Chrysler's argument that "[a]n employee's failure to avail herself of corrective opportunities provided by the employer disposes of any argument that the employer failed to act to rectify the alleged *harassment*" (Docket No. 23, p. 25 (emphasis added)) is relevant to determine whether Miracle Chrysler is entitled to the <u>Faragher</u>/<u>Ellerth</u> affirmative defense as to Anderson's now-dismissed harassment claims.  <u>Ellerth</u>, 524 U.S. at 765.  However, at issue here is whether Miracle Chrysler engaged in good faith efforts to comply with Title VII by implementing an anti-retaliation policy, and Miracle Chrysler's argument regarding Anderson's failure to report Barrett's harassment does not answer this question.

The <u>Kolstad</u> defense is an affirmative defense.  <u>New Breed Logistics</u>, 783 F.3d at 1075; <u>Reed</u>, 171 F. Supp. 2d at 748.  Where the defendant is the moving party on summary judgment as to an affirmative defense, it "must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it."  <u>Arnett</u>, 281 F.3d at 561 (citation omitted).  Miracle Chrysler has not met this burden, thus its Motion as to Anderson's punitive damages claim is denied.

## **CONCLUSION**

For the reasons stated above, Defendant's Motion for Summary Judgment (Docket No. 17) will be denied as to Anderson's claims for retaliatory discharge and punitive damages, and granted as to all other claims.

An appropriate order is filed herewith.

Entered this the 26th day of May, 2016.

_____
KEVIN SHARP, CHIEF JUDGE
UNITED STATES DISTRICT COURT